UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

In the Matter of the COMPLAINT OF
GORE MARINE CORPORATION as owner of
the Tug Captain Jerome for
exoneration from or limitation of
liability,

    Petitioner.

                    Case No. 2:08-cv-644-FtM-29DNF

_____

### OPINION AND ORDER

This matter comes before the Court on Gore Marine Corporation's Complaint for Exoneration From or Limitation of Liability (Doc. #1), filed on August 22, 2008. In due course, claims were filed by Donna J. Skaggs (Doc. #16), Great Lakes Dredge & Dock Company, LLC (Doc. #19), and Triple S Marine, LLC (Doc. #22).[1] The parties filed an Amended Joint Pretrial Statement (Doc. #109), which will govern this case to the extent it is not inconsistent with any order of the Court. A non-jury trial was held on January 11, 12, and 13, 2011. The Court's findings of fact and conclusions of law are set forth below.

### I.  Findings of Fact

On January 31, 2006, the DODGE ISLAND, a dredge owned by Great Lakes Dredge & Dock Company, LLC (GLDD), completed its work for a beach renourishment project on Captiva and Sanibel Islands in Lee

_____

[1]A claim was also filed by Odyssea Vessels, Inc., but that claim was settled.

County, Florida (the Lee County Project).  In early February 2006, GLDD Project Manager David Johanson was assigned to a beach restoration project located on the southwest coast of Florida in Collier County, Florida (the Collier County Project).  The area involved in the Collier County Project stretched from one mile south of Wiggins Pass to one mile north of Gordon Pass, and involved three separate beaches along the north Collier County shoreline.

Before the Collier County Project could start, GLDD had to transport the necessary equipment to its location.  Two such pieces of necessary equipment were a crane barge and approximately 1,100 - 1,800 feet of dredge pipe which had been involved in the Lee County Project.  GLDD chartered three tugboats to assist in preparation for towing and to tow the crane barge and the pipeline to the Collier County Project:  the CAPTAIN JEROME, a 60.3 foot tug boat owned by Gore Marine Corporation (Gore Marine); the DIANA MARIE, a tug boat owned by Triple S Marine, LLC (Triple S); and the MR. TOUP, a tug boat owned by Odyssea Vessels, Inc. (collectively, the Tugs).  During these preparations the CAPTAIN JEROME was a "24-hour boat," that is, it had a captain and a crew member on duty for a 12 hour shift, and then a relief captain and crew member on duty for the second 12 hour shift.  The CAPTAIN JEROME was equipped with radar, at least one Global Positioning Systems (GPS), and three VHF radios, as well as all required lighting.

On February 6 and 7, 2006, the Tugs worked at the direction of GLDD in preparing the equipment at the Lee County Project location for the tow to the Collier County Project location. The preparations included attaching the crane barge to a compressor barge, attaching the dredge pipe to the compressor barge, and floating and connecting the dredge pipes.

On February 6, 2006, John Haney was the captain of the CAPTAIN JEROME during the 6 a.m. to 6 p.m. shift, and the CAPTAIN JEROME was functioning as a 24-hour boat. Captain Haney is an experienced tug boat captain, with more than thirty years experience and a one hundred-ton masters of towing license. The CAPTAIN JEROME was either working or on stand-by at the derrick at the Lee County Project location until approximately 3 p.m., when Captain Haney took the CAPTAIN JEROME and its crew to a dock, probably on Sanibel Island, to drop off the relief captain and deckhand. Captain Haney was instructed that the CAPTAIN JEROME would become a 12-hour boat. Captain Haney believed this decision was made by Mr. Jack Gore (Mr. Gore), the owner of Gore Marine. Mr. Gore had no memory of making such a decision, although he conceded that someone from Gore Marine probably made the decision and that Gore Marine was responsible for the decision. Captain Haney was at the dock at 6 p.m. taking on groceries and water, and stayed at the dock all night with the CAPTAIN JEROME on "stand-by" status.

As it would turn out, the activities of four vessels the next day would eventually coalesce in the allision[2] which is the subject of this lawsuit.

On February 7, 2006, Captain Haney was still on stand-by at the dock with the CAPTAIN JEROME.  At 2 a.m., Captain Haney checked the tide, but it was not high enough to leave the dock.  At 5 a.m., Captain Haney left the dock on the CAPTAIN JEROME and returned to the derrick at the Lee County Project location.  There were no log entries by Captain Haney for the other morning hours or the daytime hours of February 7, 2006, and he was unable to remember what he did, or whether or for how long he slept during this time period.

Mid-morning on February 7, 2006, Donna Skaggs and her friend John Gillen left Estero Island in Ms. Skaggs' 24-foot Boston Whaler equipped with twin 225 horsepower Yamaha outboard motors, the MISS JIGGS, for a day of fishing in the Gulf of Mexico.  Ms. Skaggs is an avid, experienced boater who holds a 100-ton captain's license.  There was no indication of a dredge pipeline off Sanibel Island when they passed, and indeed there was none there at the time, and neither Ms. Skaggs nor Mr. Gillen heard any notices to mariners over the radio concerning a dredge pipeline in tow.  Ms. Skaggs and

---

[2]An **allision** occurs when a moving vessel strikes a stationary object, such as an anchored vessel, dock, or pier, while a **collision** occurs when a moving vessel strikes another moving vessel.  <u>Fischer v. S/Y NERAIDA</u>, 508 F.3d 586, 588 n.1 (11th Cir. 2007); <u>Superior Constr. Co. v. Brock</u>, 445 F.3d 1334, 1336 n.1 (11th Cir. 2006).  As discussed in the text, the Court finds that this case involves an allision.

Mr. Gillen fished at two locations, ending the day fishing at Edison Reef, approximately eighteen miles offshore.  At 6:14 p.m., Ms. Skaggs and Mr. Gillen saw the sunset while at Edison Reef, and then began the return trip to Estero Island.

Elsewhere on February 7, 2006, the preparations to tow the Equipment from the Lee County Project were completed, and the resulting floating dredge pipeline was approximately 1800 feet long.  The Tugs were instructed to begin the tow of the crane barge, the compressor barge and the dredge pipeline (collectively the Equipment) from the open waters off of Blind Pass to the waters of Collier County.  At approximately 3:00 p.m., the DIANA MARIE started towing the Equipment, while the MR. TOUP towed an anchor for the Equipment.  Because of anticipated bad weather, it had been decided that the tow would not make the complete trip to the Collier County Project location.  The MR. TOUP went ahead with the anchor to the south end of Sanibel Island (position 26 25.6 N 82 01.5W) (the Anchor Location), dropped off the anchor and a buoy at approximately 4:15 p.m., and then departed for a marina on the east side of Estero Island so that it could complete a crew change and load supplies.

The Anchor Location was not within the geographic area (including any "staging area" for GLDD's equipment) of the Collier County Project or the Lee County Project.  The Anchor Location was, however, beyond the "demarcation line" between Sanibel Island and Estero Island.  A "demarcation line" delineates those waters upon

which mariners must comply with the Inland Rules or must comply with The International Regulations for Preventing Collisions at Sea, 1972 (commonly referred to as the COLREGS or the Rules of the Road).  33 U.S.C. § 1601 *et seq*.  Because the Anchor Location was beyond the demarcation line, the Tugs were required to comply with the applicable COLREGS when they anchored the Equipment the evening of February 7, 2006.  The Anchor Location was in an area in which overnight anchorage was allowed, and indeed was recommended in the United States Coast Pilot.  (Joint Exh. 18, p. 242.)

According to his log, Captain Haney and the CAPTAIN JEROME caught up with the DIANA MARIE at about 6 p.m., and stayed at the stern as a following vessel.  The DIANA MARIE and the CAPTAIN JEROME arrived at the anchor location with the Equipment at approximately 6:30 p.m., and the DIANA MARIE tied the crane barge up to the anchor which had been delivered by the MR. TOUP.  The CAPTAIN JEROME assisted with the anchoring of the DIANA MARIE and the pipeline.  At the appropriate time, the proper deck lights on the DIANA MARIE were turned on.

Captain Haney tightened the pipeline and took the responsibility to check the lights on the pipeline.  At approximately 6:45 p.m., Captain Haney checked each light on the approximately 1800 feet of floating dredge pipe, and determined that stanchions had been welded to the pipeline approximately every 100 feet, that there was a square photo-electric light on each

stanchion, and that each light had been activated and was flashing yellow light.  Captain Haney testified that although he did not count the lights, there were approximately 18 lights on the length of the pipeline.  Captain Haney further testified that whatever the exact number, the lights were sufficient to show the location and course of the pipeline.  Captain Haney's log entry stated: "18:45[3] - put lights on pipe line."  (Joint Exh. 13.)

The CAPTAIN JEROME was then attached to the opposite end of the pipeline from the DIANA MARIE and anchored.  The CAPTAIN JEROME, the DIANA MARIE, and the Equipment, including the dredge pipeline, remained at anchor for the rest of the evening.  Both the CAPTAIN JEROME and the DIANA MARIE had all the appropriate deck lights on.  At 7:10 p.m., Captain Haney saw that the lights of the pipeline were activated as he went to bed onboard the CAPTAIN JEROME.  No one on board the CAPTAIN JEROME maintained a lookout or monitored the radar on the vessel after that time, and Captain Haney and the crewman slept through the subsequent events.

Frederick Hartdegen, the captain of the DIANA MARIE, testified he observed that the pipeline had lights every 100 feet.  Captain Hartdegen also stated that all the lights may not have been activated at the time of the allision because it was not quite dark.  Captain Hartdegen stated these flashing yellow lights were working that evening and were visible from 360 degrees.

---

[3]The log entries are in military time.

Meanwhile, the MISS JIGGS was returning to Estero Island and the MR. TOUP was returning from Estero Island to the Anchor Location.  Ms. Skaggs was approaching Estero Island at a speed of approximately twenty-four miles per hour.  At approximately 7:05 p.m., when it was dark[4], and from a distance which Ms. Skaggs estimated to be five miles, Ms. Skaggs first observed a vessel located between herself and the shore and in a 1:00 or 2:00 o'clock position.  Ms. Skaggs could not determine what the vessel was, speculating whether the vessel was a "large conglomerate boat" or a "shrimp boat".  As Ms. Skaggs approached the vessel, now known to have been the MR. TOUP, she could see the red and green side lights of the vessel, as well as the shore lights in the distance.  Ms. Skaggs held her course and speed, preliminarily concluding that the vessel was underway and outbound.  Ms. Skaggs and Mr. Gillen discussed the vessel, and with the vessel in about the 3:00 o'clock position, Mr. Gillen got up from his seat to get a better view.  At that moment, approximately 7:15 p.m., the MISS JIGGS struck the dredge pipeline.  Ms. Skaggs and Mr. Gillen estimated that the unknown vessel (the MR. TOUP) was located approximately 500 to 900 feet off the MISS JIGGS' starboard side at the time of impact.  Both Ms. Skaggs and Mr. Gillen testified they could see no visible lights on the pipeline.

---

[4]The parties have stipulated that it was "dark," and Ms. Skaggs' Exhibit 1 establishes that the sun set at 6:14 p.m. and that twilight ended at 6:38 p.m.

The MR. TOUP, captioned by Robert McGee, had been returning to the Anchor Location from Estero Island.  During the return voyage, Captain McGee could see at least four blinking lights that indicated the existence of the dredge pipeline, although he concedes there may have been more lights.  Captain McGee could also see the lights of the crane barge, the DIANA MARIE, and the CAPTAIN JEROME as he approached the anchor location.

The impact of the allision propelled Ms. Skaggs forward towards the cabin and Mr. Gillen into the water.  Mr. Gillen estimates that he was in the water for about fifteen minutes as he swam along the dredge pipeline towards the crane barge.  Mr. Gillen climbed aboard one of the unmanned barges, walked onto the DIANA MARIE that was tied alongside, and reported his situation to persons on board the DIANA MARIE.

The allision also caused Ms. Skaggs to be unconscious for approximately 15 minutes.  At approximately 7:32 p.m., Ms. Skaggs hailed the U.S. Coast Guard by radio and reported that her passenger had been ejected from her vessel.

The DIANA MARIE requested that the MR. TOUP, which had arrived and tied up outboard of the DIANA MARIE, take Mr. Gillen to Ms. Skaggs' vessel, located approximately one quarter of a mile away from the anchor location, at 26 25.72 North, 82 01.33 West.  At 7:41 p.m., the MR. TOUP notified the U.S. Coast Guard that it had found Mr. Gillen.  When the MR. TOUP departed with Mr. Gillen aboard, Captain McGee could see at least four lights on the dredge

pipeline.  Captain McGee could also see the dredge pipeline lights when he arrived alongside Ms. Skaggs' vessel.

The U.S. Coast Guard vessel assigned to respond to Ms. Skaggs' radio call got underway from the U.S. Coast Guard Station on Estero Island at approximately 7:40 p.m. Petty Officer Jonathan Ehrhart piloted the vessel and supervised the search and rescue mission. Approximately two minutes after departure, Petty Officer Ehrhart traveled around the northern tip of Estero Island and steered the U.S. Coast Guard vessel towards the Equipment, which he observed from a distance of at least two miles away.  Petty Officer Ehrhart observed that it was dark, but visibility was unrestricted.  Petty Officer Ehrhart could see at least six blinking white lights that were uniformly spaced in a manner that, in his view, ensured there was no mistaking it for anything other than a pipeline.  His report, written two days after the incident, stated that the dredge pipe was "well lit."  (Joint Exh. 1.)

With one exception, the following sketch drawn by the Florida Fish and Wildlife investigating officer accurately depicts the relative locations of the vessels and the pipeline at the time of the allision.  The exception is that "Tug 2", the MR. TOUP, had not arrived at the Anchor Location at the time of the allision and was not in the location depicted.  Additionally, the sketch is not drawn to scale.



## II. Conclusions of Law

The judicial power of federal courts extends to all cases of admiralty and maritime jurisdiction. U.S. Const., art. III, § 2. A federal district court generally has exclusive subject matter jurisdiction of any civil case of admiralty or maritime jurisdiction, subject to the "saving to suitors" provision. 28 U.S.C. § 1333(1). The instant case is brought and is within the admiralty and maritime jurisdiction of the federal courts. The parties agree that this case is governed by general maritime law. (Doc. #109, § X (1).)

Title 46 U.S.C. § 30505 provides:

[T]he liability of the owner of a vessel for any claim, debt, or liability described in subsection (b), shall not exceed the value of the vessel and pending freight. . .

(b) Claims subject to limitation.--Unless otherwise excluded by law, claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel,

> any loss, damage, or injury by collision, or any act,
> matter, or thing, loss, damage, or forfeiture, done,
> occasioned, or incurred, without the privity or knowledge
> of the owner.

46 U.S.C. § 30505.   Under the Limitation Act, there are three

possible outcomes.   First, an owner may be exonerated of all

liability if the owner, vessel and crew had no fault in the

accident.   To obtain exoneration, owner, vessel and crew must be

shown to have been free from any contributory fault.   American

Dredging Co. v. Lambert, 81 F.3d 127, 129 (11th Cir. 1996); Tittle

v. Aldacosta, 544 F.2d 752, 755 (5th Cir. 1977)[5].   Second, an owner

may have liability limited to the value of the vessel and its

freight if the owner, vessel or crew had some fault in the

accident, but the owner did not have privity and knowledge of the

acts of negligence or unseaworthiness that caused the accident.

Tittle, 544 F.2d at 756.   Third, an owner may be denied both

exoneration and limitation of liability, and therefore be liable

beyond the value of the ship, if the owner, vessel or crew had some

fault, and the owner had privity and knowledge of the acts of

negligence or unseaworthiness that caused the accident.   Hercules

Carriers, Inc. v. Claimant State of Florida, 768 F.2d 1558, 1563

(11th Cir. 1985).

---

[5]In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)
(en banc) the Eleventh Circuit adopted as binding precedent all the
decisions of the former Fifth Circuit handed down prior to the
close of business on September 30, 1981.

As the parties stipulate, (Doc. #109, § X(5)), the claimant bears the initial burden of proving negligence or unseaworthiness by the owner which was a contributing cause of the accident. Hercules Carriers, 768 F.2d at 1564; Suzuki of Orange Park, Inc. v. Shubert, 86 F.3d 1060, 1062-63 (11th Cir. 1996). If the claimant establishes such negligence or unseaworthiness, the burden of proof then shifts to owner to prove lack of privity or knowledge. (Doc. #109, § X(5)); Hercules Carriers, 768 F.2d at 1564; Suzuki of Orange Park, 86 F.3d at 1062-63.

In this case, this burden shifting framework may be impacted by one or both of two common law presumptions. First, the "Oregon Rule" creates a rebuttable presumption of fault against a moving vessel that, under its own power, allides with a stationary object. The Oregon, 158 U.S. 186, 197 (1895). "This presumption of negligence may be rebutted by showing, by a preponderance of the evidence, either that the allision was the fault of the stationary object, that the moving vessel acted with reasonable care, or that the allision was an unavoidable accident." Superior Const. Co. v. Brock, 445 F.3d 1334, 1339-40 (11th Cir. 2006)(quoting Bunge Corp. v. Freeport Marine Repair, 240 F.3d 919, 923 (11th Cir. 2001)); see also Fischer v. S/Y NERAIDA, 508 F.3d 586, 593-94 (11th Cir. 2007). "Vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame, by

showing that it was not in her power to prevent the collision by adopting any practicable precautions." The Virginia Ehrman, 97 U.S. 309, 315 (1877).

Second, the "Pennsylvania Rule" provides that when the stationary vessel or object is in actual violation of a statutory rule intended to prevent allisions, there is a presumption that the stationary vessel or object was at least a contributory cause of the event. Superior Const., 445 F.3d at 1340. "In such a case the burden rests upon the [stationary] ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." Id. (citation omitted.) The Pennsylvania Rule is not a rule of liability, but shifts the burden of proof as to causation. Id. at 1344. While the presumption is stringent, it is not insurmountable. Id.

The interplay of these two rules has been summarized by the Eleventh Circuit as follows:

> In cases where a stationary vessel violates a statute intended to prevent allisions and a moving vessel allides with that stationary vessel, . . . [t]he general rule is that the presumption of fault for the allision lies against the moving vessel [(i.e., Oregon Rule)]. This burden of proof shifts, however, to the stationary vessel when the stationary vessel is in violation of a statutory rule intended to prevent accidents [(i.e., Pennsylvania Rule)]. The stationary vessel then bears the burden of proof in showing that its statutory violation could not have been a contributory cause of the allision.

Id. at 1340 (quoting Sunderland Marine Mut. Ins. Co. v. Weeks Marine Constr. Co. 338 F.3d 1276, 1279 (11th Cir. 2003)). "In short, the burden of proof initially rests with the moving vessel

under the <u>Oregon</u> Rule. If the moving vessel can establish the stationary vessel violated a statutory rule intended to prevent allisions, however, then the <u>Pennsylvania</u> Rule shifts the burden to the stationary vessel." <u>Id.</u>

Finally, when both vessels involved in the allision are operating in violation of statutes designed to prevent such mishaps, the <u>Pennsylvania</u> rule requires "the district court to find that the statutory fault of both vessels contributed to the accident, unless it [finds] that the fault of either . . . could not have been a cause of the [allision] [ ]. . . . In other words, if each vessel successfully invokes the <u>Pennsylvania</u> Rule against its opponent, then each vessel must overcome a presumption of fault by showing its violation could not have been a cause of the allision." <u>Id.</u> (internal citations omitted). If neither vessel can satisfy its burden under the <u>Pennsylvania</u> Rule, then the district court must "determine the comparative fault of each vessel and allocate liability for damages accordingly." <u>Id.</u> at 1341.

The appropriate standard of care, as the parties stipulate (Doc. #109, §X(2)), is reasonable care under the circumstances. This standard of care is based upon general concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and usages. <u>Fischer</u>, 508 F.3d at 594. Reasonable care in this context is that of prudent men and women familiar with the ways and vagaries of the sea. <u>Id.</u> at 596.

As the parties further stipulate, this case is governed by the COLREGS, (Doc. #109, §X(3)), which were adopted as United States law and "apply to all vessels upon the high seas and in all waters connected therewith navigable by seagoing vessels."  33 U.S.C. § 1602.  The Uniform Inland Navigational Rules (Inland Rules) are a separate set of navigational rules, <u>Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM</u>, 447 F.3d 360, 262 n.1 (5th Cir. 2006), which do not apply in this case.  (Doc. #109, §X(4).)

The safety requirements for a vessel anchored in open water are generally higher than a vessel moored to a permanent object. <u>Sunderland Marine</u>, 338 F.3d at 1277-78.  As the Supreme Court has stated, "[w]here a vessel is at anchor in a proper place, and is observant of the precaution required by law, it is not liable for damages sustained by a vessel in motion colliding with it, but where it anchors in an unlawful position, or fails to observe the statutory requirements and such other precautions as good seamanship would suggest, it must suffer the consequences attending a violation of the law." <u>United States v. St. Louis & M.V. Transp. Co.</u>, 184 U.S. 247, 255 (1902)(citation omitted).

### III.  Application of Law to Facts

### A.  The <u>Oregon</u> Rule Presumption

As stated above, the Court finds that the MISS JIGGS was a moving vessel and that the CAPTAIN JEROME, DIANA MARIE, attached barges, and the 1800 foot of pipeline were stationary vessels and

objects.  The CAPTAIN JEROME was a vessel at anchor at a temporary location in the open water, and was not in a channel, near a channel, or in an area in which overnight anchoring was prohibited. This case involves an allision, and under the Oregon Rule there is a rebuttable presumption that the MISS JIGGS was at fault in this allision.

**B.  Efforts to Rebut Oregon Rule Presumption and Establish Pennsylania Rule Presumption**

Ms. Skaggs identifies a number of allegedly negligent acts or violations by Gore Marine (Doc. #16, ¶15a-n; Doc. #109, §XI) which are essentially intended to rebut the Oregon Rule presumption and to establish her entitlement to the Pennsylvania Rule presumption. The Court addresses each alleged act and violation.

**(1)  Operation of the CAPTAIN JEROME generally:**

Ms. Skaggs asserts that the CAPTAIN JEROME was being negligently and carelessly operated at the time of the allision. (Doc. #16, ¶15a.)  No specific factual assertions are made in this paragraph of the Claim.  Specific allegations are discussed below, and based upon those findings the Court finds that the CAPTAIN JEROME was not being negligently or carelessly operated at the time of the allision.

**(2)  Insufficient Crew:**

Ms. Skaggs asserts that the CAPTAIN JEROME was not sufficiently crewed by individuals who were adequately trained, experienced, supervised and equipped.  (Doc. #16, ¶15b.)  Because

the shipowner has a non-delegable duty to provide a competent master and crew, unseaworthiness can be caused by insufficient manning of the vessel or an incompetent crew. <u>Hercules Carriers</u>, 768 F.2d at 1563, 1565-66.

The Court finds that the CAPTAIN JEROME was properly crewed. Captain Haney was properly trained and experienced, and needed no supervision while onboard, and the vessel and crew had all the equipment needed.   There was no evidence that the crewman was inadequately trained or lacked experience, or that Captain Haney provided improper supervision to the crewman.  The Court finds that the CAPTAIN JEROME was sufficiently crewed by individuals who were adequately trained, experienced, supervised, and equipped.

**(3)  Insufficient Equipment:**

Ms. Skaggs separately asserts that the CAPTAIN JEROME was not sufficiently equipped to comply with the COLREGS and the Inland Navigation Rules, thus making it unseaworthy for its intended voyage.   (Doc. #16, ¶15c.)   Unseaworthiness may result from improper maintenance of equipment or other related failures which make the vessel ill-suited for its duties at sea. <u>Hercules Carriers</u>, 768 F.2d at 1565-66.

The parties have now stipulated that the Inland Navigation Rules do not apply to this case (Doc. #109, §X(4)), therefore this portion of the allegation is without merit.  There is no evidence that the CAPTAIN JEROME lacked any necessary or relevant equipment.

It had radar, radios, several GPSs, and proper lights.  The Court finds that the CAPTAIN JEROME was sufficiently equipped for its intended voyage, and therefore it was not unseaworthy for its intended voyage based upon a lack of equipment.

**(4)  Navigational Rules:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to comply with navigational rules designed to prevent collisions.  (Doc. #16, ¶15d.)  This paragraph of the Claim provides no specifics, and the Court discusses specific allegations below.  As more fully addressed below, the Court finds that the CAPTAIN JEROME did not fail to comply with navigational rules designed to prevent collisions.

**(5)  Failure to Maintain Lookout/Watch:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to arrange to keep a proper, safe, and vigilant lookout for vessels such as hers, in violation of COLREGS Rule 5.  (Doc. #16, ¶15e.)  The parties dispute whether Rule 5 applied to the CAPTAIN JEROME, and if so whether it was violated and whether any violation caused or contributed to the allision.  (Doc. #109, §XI(6).)

Rule 5 is within Part B of the COLREGS, which addresses "Steering and Sailing Rules."  Rule 5 COLREGS provides: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full

appraisal of the situation and of the risk of collision."   33
U.S.C. § 1602, Rule 5.  The failure to comply with this requirement
is a statutory violation which can trigger the <u>Pennsylvania</u> Rule's
presumption of negligence.  <u>Trinidad Corp. v. S.S. Keiyoh Maru</u>, 845
F.2d 818, 825-26 (9th Cir. 1988).  "The question of a proper
lookout is one of fact to be determined from all of the
circumstances on the basis of common prudence, . . ."  <u>China Union</u>
<u>Lines, Ltd. v. A. O. Andersen & Co.</u>, 364 F.2d 769, 783 (5th Cir.
1966).

The CAPTAIN JEROME was anchored in open water at a location
appropriate for overnight anchoring.  The vessel had all its proper
deck lights turned on, and was attached to the end of a 1800-foot
floating dredge pipeline.  The issue is whether there was an
obligation to also maintain a human lookout during the overnight
anchorage.  If there was such a requirement, it was clearly
violated since both the captain and the one-man crew were sleeping.

Rule 5 applies when the vessel is being steered or is under
sail, as the context and placement of the rule within the COLREGS
establishes.  This was not the situation with the CAPTAIN JEROME,
which was stationary and at anchor at the time of the allision.
The Court finds that Rule 5 did not apply to the CAPTAIN JEROME at
the time of the allision, and the CAPTAIN JEROME had no duty under
Rule 5 to post a lookout under the circumstances.  Therefore, the
Court finds that the CAPTAIN JEROME did not fail to arrange to keep

a proper, safe, and vigilant lookout for vessels such as the MISS JIGGS in violation of COLREGS Rule 5.[6]

Ms. Skaggs also asserts a violation of 33 C.F.R. § 164.19, which requires that the person "in charge of each vessel that is anchored shall ensure that: (a) A proper anchor watch is maintained; . . ." Section 164.19 applies only to self-propelled vessels over 1600 tons or to foreign vessels in waters of the United States. 33 C.F.R. § 164.01. It is undisputed that the CAPTAIN JEROME is a 71 gross ton vessel, (Joint Exhs. 16, 17), and Ms. Skaggs has conceded that § 164.19 only applies to vessels of 1600 tons or more. (Doc. #76, p. 19.) Therefore, the Court finds that § 164.19 did not apply to the CAPTAIN JEROME.

Ms. Skaggs argues there is a common law duty to maintain an anchor watch. However, the Supreme Court has held otherwise:

> Nor was the Enterprise at fault in not having a lookout. The rule stated in The Ariadne, 13 Wall. 475, 478, as to the responsibility of a moving vessel for the failure of her lookout to discover an approaching vessel in time to avoid a collision, does not apply to a vessel in the position of the Enterprise, which was at rest, without power; and the absence of a lookout upon her did not in any manner contribute to the collision.

Southern Pac. Co. v. Haglund, 277 U.S. 304, 310 (1928); see also Hutton v. Walter G. Hougland, Inc., 321 F.2d 595, 596 (5th Cir. 1963)(no duty to keep lookout or watchman aboard an anchored vessel

---

[6]The Court is unpersuaded by Cliffs-Neddrill Turnkey International-Oranjestad v. M/T Rich Duke, 947 F.2d 83, 87-89 (3d Cir. 1991). Unlike that case, the CAPTAIN JEROME was not anchored in a heavily trafficked sea lane, and that opinion failed to recognize Southern Pac. Co. v. Haglund, 277 U.S. 304, 310 (1928).

in harbor area).  The Court finds that under the totality of the circumstances in this case there was no common law duty for the CAPTAIN JEROME to maintain a lookout or anchor watch at or near the time of the allision.

**(6)   Failure to Use All Available Means to Determine Risk:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision existed, in violation of COLREGS Rule 7.  (Doc. #16, ¶15f.)  The parties dispute whether Rule 7 applied to the CAPTAIN JEROME, and if so whether it was violated and whether any violations caused or contributed to the allision.  (Doc. #109, §XI(6).)

Rule 7 is another Steering and Sailing Rule, and provides in pertinent part that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists.  If there is any doubt such risk shall be deemed to exist."  33 U.S.C. § 1602, Rule 7(a). Because the CAPTAIN JEROME was stationary, it had no obligations under Rule 7 at the time of the allision.  Rather, its lighting obligations are provided elsewhere, and are discussed below.  The Court finds that Rule 7 did not apply to the CAPTAIN JEROME at the time of the allision, and therefore the CAPTAIN JEROME was not in violation of COLREGS Rule 7 at the time of the allision. Alternatively, if Rule 7 did apply, the Court finds that the

CAPTAIN JEROME <u>did</u> use all available means appropriate under the prevailing circumstances and conditions, as discussed below.

**(7) Failure to Take Action to Avoid Collision:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to take action to avoid collision, in violation of COLREGS Rule 8.  (Doc. #16, ¶ 15g.)[7]  Rule 8, entitled "Action to Avoid Collision," is a Steering and Sailing Rule, and as found above, the CAPTAIN JEROME was stationary, being anchored in the open water.  Rule 8 did not apply to the CAPTAIN JEROME at the time of the allison, and the Court finds that the CAPTAIN JEROME therefore was not in violation of COLREGS Rule 8 at that time.

**(8)  Failure to Give Way:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to give way when her vessel approached from the starboard side and failed to take early and substantial action to keep well clear, in violation of COLREGS Rules 15 and 16.  (Doc. #16, ¶15h.)[8]

Both Rule 15 and Rule 16 are Steering and Sailing Rules.  Rule 15 provides that "[w]hen two power-driven vessels are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way and shall, if the

_____

[7]Rule 8 was not listed in the Amended Joint Pretrial Statement (Doc. #109) as a disputed issue, and therefore may have been essentially withdrawn as an issue.  In an abundance of caution, however, the Court will address the issue.

[8]See footnote 7, which also applies to this issue.

circumstances of the case admit, avoid crossing ahead of the other vessel." 33 U.S.C. § 1602, Rule 15.  The CAPTAIN JEROME was not a power-driven vessel that was crossing; it was a stationary vessel at anchor.  Rule 15 did not then apply to the CAPTAIN JEROME, and the Court finds that the CAPTAIN JEROME was not in violation of Rule 15 at the time of the allision.

Rule 16 provides that "[e]very vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear."  33 U.S.C. § 1602, Rule 16.  Since the CAPTAIN JEROME was a vessel at anchor, it was not directed by the COLREGS to keep out of the way of another vessel.  The Court finds that the CAPTAIN JEROME was not in violation of Rule 16 at the time of the allision.

**(9)  Failure to Comply with Vessel Lighting Requirements:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to comply with the lighting requirements mandated by COLREGS Rules 20 through 27. (Doc. #16, ¶¶ 15i, j.)  Ms. Skaggs further argues that even if the Court credits the testimony regarding lighting most favorably to Gore Marine as to type, positioning, and quantity, the lighting was still not in compliance with COLREGS.  (Doc. #87, p. 4.)  The parties dispute whether the specific lighting rules, Rule 24(g), 27(b), and 27(d) applied to the CAPTAIN JEROME, and if so whether they were violated and whether any violation caused or contributed to the allision.  (Doc. #109, §XI(6).)  The parties also dispute

whether Rule 20(b) is relevant to this action.   (Doc. #109, §XI(7).)

"The obligation to display proper lights is firmly established by both domestic and international regulation as part of the law of the sea. [ ] The basis for this universal requirement is to protect persons and property by enabling vessels to be able to see at night. [ ] The extreme blackness of water at night makes any departure from light rules one of the most wrecklessly [sic] unlawful acts a vessel can commit." Sunderland Marine, 338 F.3d at 1277-78 (internal citations and quotation marks omitted).  "The law as to lights is imperative . . . The master, or officer in charge, must *know* that the lights are continually up."   Id. at 1278. (emphasis in original)(citation omitted).

Rules 20 to 31 of the COLREGS address "Lights and Shapes" and apply in all weathers.  33 U.S.C. § 1602, Rule 20(a).  Rule 20(b) provides that "[t]he Rules concerning lights shall be complied with from sunset to sunrise, and during such times no other lights shall be exhibited, except such lights as cannot be mistaken for the lights specified in these Rules or do no impair their visibility or distinctive character, or interfere with the keeping of a proper look-out."  33 U.S.C. § 1602, Rule 20(b).  The Court finds no reason to believe Rule 20(b) is not relevant to this action.

The parties dispute whether Rule 24(g) applied to the CAPTAIN JEROME.  Rule 24(g) provides that "[a]n inconspicious, partly submerged vessel or object, or combination of such vessels or

objects being towed, shall exhibit: [specific lights and shapes] .
. ." 33 U.S.C. § 1602, Rule 24(g).   It is clear that the dredge
pipeline was an otherwise inconspicious, partly submerged object,
and that the CAPTAIN JEROME was attached to the pipeline.   The
objects were "being towed," although they were not moving at the
time of the allision.   The Court concludes that Rule 24(g) applied
to the CAPTAIN JEROME.

Because the pipeline was less than 25 meters in breadth, it
was required to exhibit one all-round white light at or near the
forward end and one all-round white light at or near th after end.
33 U.S.C. § 1602, Rule 24(g)(i).   Because the pipeline exceeded 100
meters in length, additional all-round white lights between the two
end lights were required to be placed at intervals not exceeding
100 meters apart.   33 U.S.C. § 1602, Rule 24(g)(iii).   The pipeline
was required to exhibit a diamond shape at or near the aftermost
extremity of the pipeline, and because the pipeline exceeded 200
meters, an additional diamond shape were it can best be seen and
located as far forward as is practicable.   33 U.S.C. § 1602, Rule
24(g)(iv).

There was no testimony that the pipeline had the two diamond
shapes required by Rule 24(g)(iv).   There was also no testimony
that there were any all-round white lights anywhere along the
length of the pipeline.   The Court credits the testimony of the
various witnesses who testified that the pipeline was lit with

flashing lights (although the testimony varied as to whether they were yellow or white) and the witnesses who testified that the lights on the pipeline established the location and course of the pipeline.  While the number of such lights was not consistently reported, the Court finds that the lights were at least numerically sufficient to satisfy the 100 meter spacing requirement of Rule 24(g)(iii).  The Court additionally credits the testimony of those witnesses who testified that the CAPTAIN JEROME and the DIANA MARIE were properly lit and attached to opposite ends of the pipeline at anchor.

The Court does not doubt the testimony of Ms. Skaggs and Mr. Gillan that they did not <u>see</u> lights on the pipeline or the lights on the vessels.  The Court rejects the argued inference from this testimony that the pipeline or vessels did not <u>have</u> any illuminated lights.  The Court also did not find creditable the suggestion that the CAPTAIN JEROME and/or the DIANA MARIE were not properly lighted or, in the case of the CAPTAIN JEROME, the closing argument suggestion that it was not even present that evening.  In sum, the Court finds that while the CAPTAIN JEROME and the pipeline were well lit, the pipeline was not in compliance with the requirements of Rule 24(g).

The parties also dispute the applicability of Rule 27(b) and (d).  Rule 27(b) provides that "[a] vessel restricted in her ability to maneuver, except a vessel engaged in mineclearance operations, shall exhibit: [specific lights and shapes]. . . ." 33

U.S.C. § 1602, Rule 27(b).  Rule 27(d) provides that "[a] vessel
engaged in dredging or underwater operations, when restricted in
her ability to maneuver, shall exhibit the lights and shapes
prescribed. . . ."  33 U.S.C. § 1602, Rule 27(d).  A vessel at
anchor is not "restricted in her ability to maneuver" within the
meaning of Rule 27(b).  Additionally, the CAPTAIN JEROME was not
"engaged in dredging" within the meaning of Rule 27(d).
Accordingly, the CAPTAIN JEROME was not required to comply with
either Rule 27(b) or Rule 27(d).  Additionally, the undisputed
testimony established that the CAPTAIN JEROME was properly lit
while at anchor that night.

**(10) Failure to Comply With Signal Requirements:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to comply
with the sound and sight signals required by COLREGS Rules 32
through 36.  (Doc. #16, ¶15k.)[9]  There was not sufficient evidence
to establish that the CAPTAIN JEROME did not have a whistle and
bell, as required by Rule 33, or that the "Maneuvering and Warning
Signals" of Rule 34 or the "Sound Signals in Restricted Visibility"
of Rule 35 or the "signals to Attract Attention" of Rule 36 were
violated.  The evidence does not convince the Court that the
CAPTAIN JEROME failed to comply with the sound and sight signals
required by COLREGS Rules 32 through 36.

---

[9]See footnote 7, which also applies to this issue.

**(11)  Pipeline Lighting Requirements, 33 C.F.R. § 88.15:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to comply with 33 C.F.R. § 88.15 with regard to the lighting requirements of the floating dredge pipeline.  (Doc. #16, ¶15l.)  The parties dispute whether § 88.15 applied to the CAPTAIN JEROME, and if so whether it was violated and whether any violation caused or contributed to the allision.  (Doc. #109, §XI(10).)

Title 33 C.F.R. § 88.15 provides that floating dredge pipelines shall display certain lights at night and in periods of restricted visibility.  Section 88.15 is part of the Inland Navigation Rules, which the parties have stipulated do not apply in this case.  (Doc. #109, §X(4).)  The Court agrees that the Inland Navigation Rules did not apply to the CAPTAIN JEROME at the time of the allision.

**(12)  Failure to Properly Use Radar:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to properly use radar equipment to determine an incoming vessel's course and then warn the approaching vessel of the 1800 foot pipeline being towed, in violation of COLREGS Rule 19.  (Doc. #16, ¶15m.)

Rule 19 is part of the "Steering and Sailing Rules" and applies "to vessels not in sight of one another when navigating in or near an area of restricted visibility." 33 U.S.C. § 1602, Rule 19(a).  It requires every vessel to proceed at a safe speed, Rule 19(b), and with respect to radar, provides:

(d) A vessel which detects by radar alone the presence of another vessel shall determine if a close-quarters situation is developing and/or risk of collision exists. If so, she shall take avoiding action in ample time, provided that when such action consists of an alteration of course, so far as possible the following shall be avoided:

(i) an alteration of course to port for a vessel forward of the beam, other than for a vessel being overtaken; and
(ii) an alteration of course toward a vessel abeam and abaft the beam.

33 U.S.C. § 1602, Rule 19(d). Rule 19 did not apply to the CAPTAIN JEROME since it was not navigating, but was a stationary vessel at anchor in open waters with all its proper lights illuminated, and no "alteration of course" was possible.

**(13)   Failure to Comply With Radiotelephone Requirements:**

Ms. Skaggs asserts that the CAPTAIN JEROME failed to comply with 33 C.F.R. § 26, which requires tows to receive and transmit information necessary to the safe navigation of vessels. (Doc. #16, ¶15n.) The parties dispute whether 33 C.F.R. § 26.01 applied to the CAPTAIN JEROME, and if so whether it was violated and whether any violations caused or contributed to the allision. (Doc. #109, §XI(8).)

Certain radiotelephone requirements apply to certain vessels "while navigating," and to every "dredge and floating plant engaged in or near a channel or fairway in operations likely to restrict or affect navigation of other vessels except for an unmanned or intermittently manned floating plant under the control of a

dredge."   33 C.F.R. § 26.03(a).   In this case, the CAPTAIN JEROME
was not navigating, but was stationary and at anchor.   <u>Self Towing,
Inc. v. Brown Marine Services, Inc.</u>, 837 F.2d 1501, 1505 n.12 (11th
Cir. 1988).   Neither the CAPTAIN JEROME itself nor the other
components of the flotilla were engaged in or near a channel or
fairway.   The Court finds that the radiotelephone requirements of
33 C.F.R. § 26 did not apply to the CAPTAIN JEROME at the time of
the allision.

**(14)   Failure to Maintain Proper Hours of Rest:**

Ms. Skaggs asserts that Captain Haney was working on board the
CAPTAIN JEROME without the proper amount of sleep.   The parties
dispute whether 46 U.S.C. § 8104 applied to the CAPTAIN JEROME, and
if so whether it was violated and whether any violation caused or
contributed to the allision.   (Doc. #109, §XI(9).)

Title 46 U.S.C. § 8104 provided in pertinent part that "[a]n
owner, charterer, managing operator, master, individual in charge,
or other person having authority may permit an officer to take
charge of the deck watch on a vessel when leaving or immediately
after leaving port only if the officer has been off duty for at
least 6 hours within the 12 hours immediately before the time of
leaving."   46 U.S.C. § 8104(a).

No documentary evidence was presented to establish whether
Captain Haney had been off duty a sufficient number of hours, or
whether he had slept, or whether he was on duty continuously.

Captain Haney had no clear memory of if or when he slept during this time period, but testified that he may have slept during the hours that were unaccounted for in his log, and whatever hours he put in did not affect his judgment.  The evidence fails to convince the Court that § 8104(a) was violated in this case.

**(15)  Obstruction of Navigable Waters:**

Ms. Skaggs asserts that the CAPTAIN JEROME violated 33 U.S.C. § 403 and § 409 because it, either alone or as part of an anchored flotilla, constituted an obstruction of navigable waters of the United States, and thus required a permit from the United States Army Corps of Engineers pursuant to 33 C.F.R. § 320 *et seq.*  The parties dispute whether 46 U.S.C. §§ 403 and 409 applied to the CAPTAIN JEROME, and if so whether they were violated and whether any violations caused or contributed to the allision.  (Doc. #109, §XI(11)).

Title 33 U.S.C. § 409 provides in pertinent part that "[i]t shall not be lawful to tie up or anchor vessels or other craft **in navigable channels** in such a manner as to prevent or obstruct the passage of other vessels or craft; . . ."  33 U.S.C. § 409 (emphasis added).  Section 403, in turn, provides that the "creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; . . ." without a permit from the Corps

of Engineers.   33 U.S.C. § 403.   As the Eleventh Circuit has

stated:

> A vessel may not be placed in navigable waters unless a
> permit is obtained, 33 U.S.C. § 403. Moreover, no vessel
> may be anchored in navigable channels in such a manner
> that prevents the safe passage of other vessels, 33
> U.S.C. § 409. The purpose of these statutes is to
> preserve safe passage by other vessels. The issue of
> whether  an  anchorage  or  mooring  constitutes  an
> obstruction  to  navigation  is  to  be  determined  by
> reference to all the relevant facts and circumstances. .
> . . A violation of § 409 shifts the burden of proof onto
> the party who obstructed the navigable waters.

Sunderland Marine, 338 F.3d at 1279 (citations and internal

quotation marks omitted).  The § 409 prohibition is not absolute,

and  literal  non-compliance  may  be  excused  under  appropriate

circumstances.  Atlantic Refining Co. v. Moller, 320 U.S. 462, 466

(1943).   Whether  there  is  an  obstruction  of  navigation  is

determined  by  reference  to  all  the  relevant  facts  and

circumstances.  Self Towing, 837 F.2d at 1504.

The credible evidence in this case was that the CAPTAIN JEROME

and the DIANA MARIE were anchored at the time of the allision, and

that neither vessel nor any part of the flotilla was anchored in a

navigable channel, but in the open waters.  No dredging activities

were taking place.  Additionally, the Court finds that the credible

evidence establishes that the flotilla in general and the CAPTAIN

JEROME in particular was not tied up or anchored in such a manner

as to prevent or obstruct the passage of other vessels or crafts,

and did not constitute an obstruction of navigable waters within

the meaning of § 409.  Unlike <u>Sunderland</u>, the allision in this case did not take place in or near inland waters or in a channel. <u>Sunderland</u>, 338 F.3d at 1279.  Only a relatively small percentage of the waterway's width was obstructed, and this was in an area far from the entry to the channel, in open waters, and with no navigational difficulties generally or under the conditions on that evening.  The Court finds that the CAPTAIN JEROME was not in violation of 33 U.S.C. § 403 or § 409.

**(16)  Failure to Comply with Fla. Stat. § 327.44:**

Ms. Skaggs asserts that the CAPTAIN JEROME violated Fla. Stat. § 327.44.  The parties dispute whether Fla. Stat. § 327.44 applied to the CAPTAIN JEROME, and if so whether this statute was violated and whether any violation caused or contributed to the allision. (Doc. #109, §XI(12).)

Florida Statute § 327.44 provides that "[n]o person shall anchor, operate, or permit to be anchored, except in case of emergency, or operated a vessel or carry on any prohibited activity in a manner which shall unreasonably or unnecessarily constitute a navigational hazard or interfere with another vessel. Anchoring under bridges or in or adjacent to heavily traveled channels shall constitute interference if unreasonable under the prevailing circumstances."  Fla. Stat. § 327.44.  If this statute applies, it was not violated by the CAPTAIN JEROME.  The CAPTAIN JEROME was not anchored in a manner which unreasonably or unnecessarily

constituted a navigational hazard or interfered with another vessel.  The CAPTAIN JEROME was not anchored under a bridge or in or adjacent to a channel.  There was no credible evidence that the location of the anchorage was unreasonable under the prevailing circumstances.  The Court finds that the CAPTAIN JEROME did not violate Fla. Stat. § 327.44.

**(17)  Army Corps Permit or Manual:**

Ms. Skaggs asserts that the CAPTAIN JEROME violated the U.S. Army Corps of Engineers' permit or manual.  The parties dispute whether the U.S. Army Corps of Engineers' permit or manual applied to the CAPTAIN JEROME, and if so whether either was violated and whether any violation caused or contributed to the allision.  (Doc. #109, §XI(13).)

The CAPTAIN JEROME was not involved in any dredging activities at the time of the allision.  There was no evidence at trial that any permit from the Army Corps of Engineers was required for an overnight anchorage at the location of the allision.  There was no evidence of any permitting violation with regard to actual dredging operations, and in any event, any such permit violations had no causative affect on the allision.  The Court finds that the CAPTAIN JEROME did not violate any then-applicable Army Corps of Engineers permit or manual provision.

**(18)  Applicability of COLREGS Rule 2:**

The parties dispute whether COLREGS Rule 2 applied to the CAPTAIN JEROME.  (Doc. #109, §XI(6).)  Rule 2 provides:

> (a) Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.
> (b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

33 U.S.C. § 1602, Rule 2.  The Court concludes that Rule 2 did apply to the CAPTAIN JEROME at all times relevant to this case. What constitutes "reasonable care" changes with the circumstances, and is not violated simply because something more could have been done.  <u>Fischer</u>, 508 F.3d at 594.  While Rule 2 applied, there were no special circumstances in this case which required the CAPTAIN JEROME to take other actions in order to have acted with reasonable care.

- - - -

In sum, the Court finds that the CAPTAIN JEROME was anchored in a recommended location, outside of a navigational channel.  The lighting on the dredge pipeline was not in compliance with Rule 24(g) for the reasons stated above, although both adjoining Tugs were appropriately lit and the pipeline was well lit.  Because the CAPTAIN JEROME was not in full compliance with Rule 24(g), and Rule

24(g) is a statutory rule intended to prevent allisions, Ms. Skaggs has rebutted the presumption in the <u>Oregon</u> Rule that the MISS JIGGS was at fault.

## C.  **Pennsylvania Rule**

Because of the Rule 24(g) violation, the <u>Pennsylvania</u> Rule provides that there is a presumption that the CAPTAIN JEROME was at least a contributory cause of the allision.  The other parties, however, also invoke the <u>Pennsylvania</u> Rule against the MISS JIGGS by asserting she was also in violation of various "rules of the road."  The Court need not resolve all the claimed violations by the MISS JIGGS because it finds two primary violations which bring the MISS JIGGS within the <u>Pennsylvania</u> Rule.

The parties stipulate that the COLREGS applied to the MISS JIGGS.  (Doc. #109, § X (3).)  COLREGS Rule 6 provides that "[e]very vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."  33 U.S.C. § 1602, Rule 6.  Whether a speed is "safe" depends on the circumstances, including visibility, traffic density, the vessel's capabilities, sea conditions, and draught relative to total depth.  <u>Otal Invs. Ltd. v. M.V. Clary</u>, 494 F.3d 40, 55 (2d Cir. 2007).  COLREGS Rule 7(a) provides that "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to

determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist." 33 U.S.C. § 1602, Rule 7(a).

Ms. Skaggs testified that she was aware of a vessel of some sort at a substantial distance from her and could see both the red light and the green light of that vessel. Being able to see both the red and green lights meant the vessel was on a collision course, but given the distance separating the two there was no immediate danger. As Ms. Skaggs got closer to the unidentified vessel, however, she continued to be unable to determine what it was. Given this uncertainty, at some point prior to the allision the MISS JIGGS had a obligation to reduce her speed (Rule 6) and alter her course (Rule 7) to avoid the risk of collision or allision. Ms. Skaggs concedes she did neither. The Court has found that the vessels and the pipeline were well lit, and at the very least the MISS JIGGS violated her duties regarding speed and course given the uncertainty about the situation she encountered. Considering the totality of the circumstances, the Court concludes that the MISS JIGGS violated Rule 6 and Rule 7.

## D.  No Contributing Fault By The CAPTAIN JEROME

As discussed earlier, when both vessels involved in an allision are operating in violation of statutes designed to prevent such mishaps, the Pennsylvania rule requires the district court to find that the statutory fault of both vessels contributed to the accident, unless it finds that the fault of either could not have

been a cause of the allision.  The Court finds that the lack of the diamond shapes and the lack of all-round white non-blinking lights on the pipeline could not have been the cause of the allision in this case.  Because the diamond shapes are not required to be illuminated, the presence or absence of diamond shapes make no difference at night.  The pipeline was well lit with a sufficient number of flashing yellow lights, and at each end a well-lit tug was anchored.  There is simply nothing to suggest that a person who failed to see these lights would have seen the lights on the pipeline if they has been round and steadily white.  The Court's conclusion is that the accident was caused by Ms. Skaggs's failure to see the lights on the CAPTAIN JEROME and the pipeline, not because of the shape or color of the lights.  Accordingly, the Court finds that shape, color, and flashing of the lights on the pipeline could not have contributed to the allision.  Judgment of exoneration will be entered in favor of Gore Marine Corporation.

Accordingly, it is now

**ORDERED**:

1. Judgment shall be entered in favor of Gore Marine Corporation as to its Complaint for Exoneration From or Limitation of Liability (Doc. #1) to the extent that Gore Marine Corporation is exonerated from liability to any person or entity for any damages, demands, or claims whatsoever arising out of the allision on February 7, 2006, between the MISS JIGGS and the CAPTAIN JEROME.

2.    The Claim of Donna J. Skaggs (Doc. #16) is **DENIED** as to Gore Marine Corporation.

3.    The Claim (Doc. #19) of Great Lakes Dredge & Dock Company, LLC, and the Motion for Summary Judgment (Doc. #71) are **DENIED AS MOOT**.

4.    The Claim (Doc. #22) of Triple S Marine, LLC is **DENIED AS MOOT**.

5.    The Clerk shall enter judgment, terminate all pending motions and deadlines as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __10th__ day of February, 2011.


_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of record